IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| PAMELA HIGGINS | : | CIVIL ACTION |
| | : | |
| v. | : | |
| | : | |
| ANDREW SAUL, | : | |
| Commissioner of Social Security | : | NO. 19-2934 |

OPINION

JACOB P. HART  　　　　　　　　　　　　　　　　　DATE:  5/19/20
UNITED STATES MAGISTRATE JUDGE

　　　　Pamela Higgins brought this action under 42 USC § 405(g) to obtain review of the decision of the Commissioner of Social Security denying her claim for Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI").  She has filed a Request for Review to which the Commissioner has responded.  As below, this matter will be remanded for the taking of additional evidence from a rheumatologist and a revised assessment of Higgins' subjective representations under Social Security Ruling 16-3p.

I.　　　Factual and Procedural Background

　　　　Higgins was born on April 28, 1969.  Record at 190.  She completed high school.  Record at 215.  She worked in the past as a customer service representative for an insurance company, and as a non-medical home healthcare aide.  Record at 216.

　　　　On February 26, 2016, Higgins applied for DIB and SSI.  Record at 190, 192.  She alleged disability beginning February 9, 2016, as a result of fibromyalgia, chronic fatigue syndrome, irritable bowel syndrome, interstitial cystitis, herniated spinal discs, migraine headaches, arthritis, and bipolar disorder.  Record at 214.  Her applications were denied.  Record at 101, 102.

Higgins then sought *de novo* review by an Administrative Law Judge ("ALJ"). Record at 117, 119. A hearing was held in this matter on February 21, 2018. Record at 33. In a written decision dated March 18, 2018, however, the ALJ denied benefits. Record at 10. The Appeals Council denied Higgins's request for review, permitting the ALJ's decision to stand as the final decision of the Commissioner. Record at 1. Higgins then filed this action.

II.   Legal Standards

The role of this court on judicial review is to determine whether the Commissioner's decision is supported by substantial evidence. 42 U.S.C. §405(g); Richardson v. Perales, 402 U.S. 389 (1971); Doak v. Heckler, 790 F.2d 26, 28 (3d Cir. 1986); Newhouse v. Heckler, 753 F.2d 283, 285 (3d Cir. 1985). Substantial evidence is relevant evidence viewed objectively as adequate to support a decision. Richardson v. Perales, supra, at 401; Kangas v. Bowen, 823 F.2d 775 (3d Cir. 1987); Dobrowolsky v. Califano, 606 F.2d 403 (3d Cir. 1979). Moreover, apart from the substantial evidence inquiry, a reviewing court must also ensure that the ALJ applied the proper legal standards. Coria v. Heckler, 750 F.2d 245 (3d Cir. 1984).

To prove disability, a claimant must demonstrate that there is some "medically determinable basis for an impairment that prevents him from engaging in any 'substantial gainful activity' for a statutory twelve-month period." 42 U.S.C. §423(d)(1). As explained in the following agency regulation, each case is evaluated by the Commissioner according to a five-step process:

> (i) At the first step, we consider your work activity, if any. If you are doing substantial gainful activity, we will find that you are not disabled. (ii) At the second step, we consider the medical severity of your impairment(s). If you do not have a severe medically determinable physical or mental impairment that meets the duration requirement in §404.1590, or a combination of impairments that is severe and meets the duration requirement, we will find that you are not disabled. (iii) At the third step, we also consider the medical severity of your impairment(s). If you have an impairment(s that meets or equals one of our listings in appendix 1 of this subpart and meets the

2

duration requirement, we will find that you are disabled. (iv). At the fourth step, we consider our assessment of your residual functional capacity and your past relevant work. If you can still do your past relevant work, we will find that you are not disabled. (v). At the fifth and last step, we consider our assessment of your residual functional capacity and your age, education and work experience to see if you can make an adjustment to other work. If you can make an adjustment to other work, we will find that you are not disabled. If you cannot make an adjustment to other work, we will find that you are disabled.

20 CFR §404.1520 (references to other regulations omitted).

III.     The ALJ's Decision and Higgins's Request for Review

In his decision, the ALJ determined that Higgins suffered from the severe impairments of fibromyalgia, a mood disorder, and an anxiety disorder. Record at 15. He found that she also suffered from irritable bowel syndrome, interstitial cystitis, arthritis in her hips and lumbar spine, orthopedic foot impairments, high glycemia, hyperlipidemia, and obesity, but that these were not severe impairments. Record at 16-17. The ALJ went on the write that, although there was evidence of continuing complaints of chest pain and heart palpitations, no abnormalities were identified on objective testing, so that most cardiac complaints had been ruled out by Higgins' physicians. Id.

The ALJ found that no impairment, and no combination of impairments, met or medically equaled a listed impairment. Record at 17-19. He wrote:

> After careful consideration of the entire record, I find that the claimant has the residual functional capacity ["RFC"] to perform light work … except that she can occasionally climb ladders, ropes, stairs or ramps; she can occasionally kneel, stoop, crouch, crawl. The claimant can occasionally work at unprotected heights or around hazardous machinery. The claimant is limited to simple, repetitive tasks in a static environment. She cannot perform fast-paced or strictly time-limited tasks, such as assembly line work or strict quota work. Finally, the claimant must be allowed to change position briefly – about 5-10 minutes every hour – but she can stay on task while doing so.

Record at 19.

Relying upon the testimony of a vocational expert who appeared at the hearing, the ALJ found that Higgins could not return to her prior work. Record at 25. However, she could work at the light exertional level as a linen grader, silverware wrapper, or restroom attendant. Record at 26. The ALJ also made an alternative finding that, at the sedentary level, Higgins could work as a final assembler, eyeglass frame polisher, or lens inserter. Record at 26-7. The ALJ decided, therefore, that Higgins was not disabled. Record at 27.

In her Request for Review, Higgins argues that the ALJ's evaluation of the opinions of her treating general practitioner, Louis Kleiman, DO, and consulting examiner Ziba Monfared, MD, was not supported by substantial evidence. She also argues that the ALJ did not consider the correct factors in evaluating her claim of pain. Finally, she maintains that the ALJ wrongly failed to consider the side effects of her medications.

IV.     Discussion

A.      The Medical Reports

1.      Dr. Kleiman

Dr. Kleiman submitted to the record a Fibromyalgia RFC Questionnaire, dated December 20, 2016. In it, he indicated that the symptoms of Higgins's fibromyalgia included multiple tender points, nonrestorative sleep, chronic fatigue, morning stiffness, muscle weakness, subjective swelling, irritable bowel syndrome, frequent severe headaches, numbness and tingling, breathlessness, anxiety, panic attacks, depression, and chronic fatigue. Record at 1041. As a result of these symptoms, according to Dr. Kleiman, Higgins could sit for less than two hours in an eight-hour workday, and could stand and walk for less than an additional two hours. Record at 1043. Obviously, this would preclude all work.

The ALJ gave this questionnaire "little weight." He wrote:

> Apparently dated December 2012, this assessment would be too attenuated to be useful in determining the claimant's residual functional capacity for the relevant period under consideration. Even if this date is written in error, I find the statement of little persuasive value. Though Dr. Kleiman noted that he treated the claimant every three months, at later visits, he often had no personal contact with the claimant, though he may be presumed to have reviewed the records made by his colleagues and assistants. Even so, despite his summary conclusion that the claimant met the American College of Rheumatology criteria for fibromyalgia, he does not in his opinion summarize the positive findings that underlie his conclusion; this would be demonstrated much later when he ruled out polyarthritis by verifying rheumatoid factor. As of February 2016, lupus had not been ruled out as the underlying cause of her symptoms. Finally, Dr. Kleiman's early opinion is not consistent with his generally benign findings on physical examinations of the claimant during the relevant period of disability alleged.

Record at 24.

Higgins argues that the ALJ's analysis of this questionnaire was inadequate. As the District Court for the Western District has explained in detail, consideration of a claim of fibromyalgia presents specific challenges:

> Fibromyalgia "is a complex medical condition characterized primarily by widespread pain the joints, muscles, tendons, or nearby soft tissues that has persisted for at least 3 months." SSR 12-2p. There are "unique difficulties associated with diagnosing fibromyalgia, as there are no objective tests which conclusively confirm the disease." Merritt v. Berryhill, 2018 WL 1162848 at *10 (E.D. Pa. Mar. 5, 2018), (*citing* Green-Younger v. Barnhart, 335 F.3d 99, 108 (2d Cir. 2003)). "Due to the subjective nature of the diagnosis, the credibility of a claimant's testimony regarding her symptoms is especially significant in the evaluation of the evidence." Gregory v. Berryhill, Civ. No. 17-991, 2019 WL 643736 at *8 (D. Del. Feb. 15, 2019) (citing Singleton v. Astrue, 542 F. Supp.2d 367, 378 (D. Del. 2008) (internal quotation marks and citations omitted)). The:
>> "cause is unknown, there is no cure, and it is poorly-understood within much of the medical community. The disease is diagnosed entirely on the basis of patients' reports of pain and other symptoms. The American College of Rheumatology issued a set of agreed-upon diagnostic criteria in 1990, but to date there are no laboratory tests to confirm the diagnosis." Benecke v. Barnhart, 379 F.3d 587, 590 (9th Cir. 2004). In fact, fibromyalgia patients often "manifest normal muscle strength and neurological reactions and have full range of motion." (citing Preston v. Secretary of Health and Human Services, 854 F.2d 815, 820 (6th Cir. 1988)). In order to diagnose fibromyalgia, a series of focal points must be tested for tenderness and other conditions must be ruled out through objective medical and clinical trials. Id. at 244. Symptoms associated with fibromyalgia

>include "pain all over," fatigue, disturbed sleep, stiffness, and tenderness occurring at eleven of eighteen focal points. Sarchet v, Chater, 78 F.3d 305, 306 (7th Cir. 1996)."

Lintz v. Astrue, Civ. No. 8-424, 2009 WL 1310646 at *7 (W.D. Pa. May 11, 2009). Payne v. Berryhill, Civ. A. No. 18-76, 2019 WL 1082488, at *2 (W.D. Pa. 2019).

I agree with Higgins that the ALJ's consideration of Dr. Kleiman's questionnaire was not in accordance with agency guidance and caselaw respecting the treatment of fibromyalgia claims. First, his observations regarding the ruling out (or failure to rule out) polyarthritis or lupus are irrelevant to an assessment of the questionnaire.[1] SSR 12-2p specifies that alternative diagnoses should be ruled out before a fibromyalgia diagnosis is accepted, but this is a matter to be addressed at stage two of the sequential evaluation. Once – as here – an ALJ finds that fibromyalgia is a severe impairment, alternative diagnoses are no longer at issue. See Accomando v. Commissioner of Social Security, Civ. A. No. 13-1391, 2014 WL 6389060 at *7 (D.N.J., Nov. 14, 2014).

Further, it was inaccurate to say that Dr. Kleiman offered no positive findings underlying his conclusions. As noted above, Dr. Kleiman checked off that Higgins suffered from many symptoms of fibromyalgia. Record at 1041. Although Dr. Kleiman did not support these positive findings with specific citations, his records were full of references to many of the symptoms he identified.

---

[1] The point the ALJ intended to make in writing that polyarthritis was ruled out "much later" is not clear to me. In any event, he was mistaken. The ALJ misread the handwritten date on the questionnaire as 12/20/12. It was really 12/20/16. Although the ALJ added that he would not give the questionnaire much weight even if the date was erroneous (in fact, the error was his own), his mistake is significant because it led him to criticize Dr. Kleiman based on an erroneous timeline. In fact, Dr. Kleiman was aware that Higgins had a normal rheumatoid factor a year before he completed the questionnaire. Record at 754. Similarly, although the ALJ suggested that the "early" questionnaire was undermined by benign examination results, the questionnaire was in fact completed after Dr. Kleiman had treated Higgins for at least two years, so that most of the treatment notes in the record had already been created. Record at 701 (treatment noted dated January, 2016).

Specifically, irritable bowel syndrome was well-documented. Record at 15, 732, 1061. Higgins was also treated in July and October, 2017, for a GI bleed with no clear cause. Record at 1000, 1001. Chronic fatigue syndrome was frequently mentioned. Record at 704, 715, 986, 987, 996. On June 27, 2017, Dr. Kleiman agreed to prescribe medicine for Higgins's "mood disorder." Records at 998. (The record also contains treatment records from mental health practitioners). Consulting examiner Ziba Monfared, MD, found 14 out of 18 trigger points to be present. Record at 792. Also, Higgins presented at an emergency room in February, 2017, complaining of shortness of breath. Record at 857.

Indeed, the ALJ found Higgins's mood disorder and anxiety to constitute severe impairments, and her irritable bowel syndrome to be a non-severe impairment. Record at 15-16. Therefore, there is no controversy as to the existence of these symptoms, all of which Dr. Kleiman checked off on the questionnaire.

As to "benign findings on physical examination," some of them are of dubious relevance to a claim of fibromyalgia:

> In stark contrast to the unremitting pain of which [fibromyalgia] patients complain, physical examinations will usually yield normal results – a full range of motion, no joint swelling, as well as normal muscle strength and neurological reactions.

Foyle v. Barnhart, 432 F. Supp.2d 465, 480 (M.D. Pa. 2005), quoting Lisa v Secretary of the Dep't of Health and Human Services, 940 F.2d 40, 45 (2d Cir. 1991).

Certainly, it is relevant to Higgins's claim of disabling pain that Dr. Kleiman frequently found her to be free of arthralgia (joint pain), even though that would not rule out myalgias (muscle pain). Record at 704, 711, 715, 984, 986. Also, notes recording body pains attributed to fibromyalgia are present in the record. Fibromyalgia pain was referred to in June, 2016. Record at 984. In November, 2015, and again on December 13, 2016, it was noted that Higgins used

7

Tylenol with codeine to address her fibromyalgia pain "on occasion." Record at 719, 991. An April 27, 2017, note stated: "She will have to stop working secondary to her pain and fatigue." Record at 996. (Higgins worked part-time as a crossing guard for a while after her alleged disabled date).

Further, a note prepared on December 17, 2017, a few days before Dr. Kleiman signed the questionnaire, read:

> She is having increase in her fibromyalgia symptoms normally they be [*sic*] once or twice a week now they seem every other day. She would have to usually rest for an hour a day to help symptom relief now she has to rest for 3 or 4 hours with each episode if not longer.

Record at 1003. This is not to say that the ALJ was required to credit every statement Higgins made to Dr. Kleiman. The point is that it was inaccurate to say that Dr. Kleiman's examination notes failed to support the existence of pain.

Finally, it is not clear that Dr. Kleiman's questionnaire was significantly undermined by the fact that Higgins was sometimes seen by a physician's assistant from his practice, rather than by the doctor himself. Record at 701-702, 708, 714, 717, 721, 988. Agency regulations acknowledge that it is increasingly common for a patient to be seen by a paraprofessional such as a nurse practitioner or physician's assistant. See SSR 06-3p. In this case, Dr. Kleiman – a qualified physician – reviewed, adopted, and signed all notes made by anyone other than himself.

As a whole, the 973-page medical record in this case shows that Higgins has sought much medical attention for cystitis, cardiac palpitations, gastrointestinal complaints, and orthopedic complaints, making numerous trips to the emergency room. Yet, objective testing often failed to find underlying conditions. Record at 712 (full range of motion in shoulder), 717 (negative x-ray of sore toe), 727 (no objective data for arrhythmia), 728 (no objective data for right flank pain; possibly irritable bowel syndrome), 737 ("nothing objective from the cardiovascular

standpoint"), 751 (normal sedimentation rate), 766 ("mild" osteoarthritis), 857 (no cause found for shortness of breath), 946 (no gastrointestinal abnormality found).

This could be seen as evidence of symptom exaggeration. However, it is also strikingly consistent with the features of fibromyalgia, as set forth on the questionnaire. Because the ALJ's reasons for declining to credit Dr. Kleiman's report were inadequate – and also because Dr. Kleiman is a general practitioner and not a specialist in musculoskeletal disorders – I will direct that the matter be remanded for review of the medical record by a rheumatologist with experience in diagnosing and treating fibromyalgia. This specialist should opine on the reliability of the diagnosis of fibromyalgia, and the likely extent of Higgins's functional capacity during the relevant period, given the existing records.

2. <u>Dr. Monfared</u>

Dr. Monfared examined Higgins on May 19, 2016. Record at 790. She diagnosed Higgins with fibromyalgia, chronic fatigue syndrome, lumbar pain with radiculopathy, interstitial cystitis, asthma, and a mood disorder. <u>Id</u>. Dr. Monfared found that Higgins was able to lift and carry up to 20 pounds on a regular basis and 50 pounds occasionally, and that she could sit for four hours at a time, and up to eight hours in an eight-hour workday. Record at 794-5. However, she found that Higgins could stand and walk only two hours each in an eight-hour workday. Record at 795. She also indicated that Higgins could never kneel, crouch, or crawl. Record at 797. She could only occasionally climb, balance, or stoop. <u>Id</u>.

The ALJ credited Dr. Monfared's report only in part, accepting some of the limitations imposed, and rejecting others. Record at 24. Although Higgins has accused the ALJ of "cherry picking" the findings, the ALJ spent considerable time explaining how he found certain limitations consistent with other evidence of record, and how he concluded that other limitations

were inconsistent. Record at 23-24. Nevertheless, the ALJ may need to review his analysis of Dr. Monfared's opinions on remand to accommodate the evidence provided by the rheumatologist.

B.   The Pain Evaluation

The ALJ wrote that, although Higgins's medically determinable impairments could reasonably be expected to cause the alleged symptoms, he did not find that her statements concerning the intensity, persistence, and limiting effects of the symptoms were entirely consistent with the other evidence "for the reasons explained in this decision." Record at 22-3. He continued:

> The claimant testified to chronic all-over pain, worse in back, and chronic fatigue. The record sufficiently documents the diagnosis of fibromyalgia, but the medical notes do not confirm that the claimant was reporting the symptoms and limitations to her doctors that she described at the hearing. Records from the claimant's provider show that at least some of her physical complaints are somatic and improve with her mood or anxiety control. The claimant does display non-exertional symptoms of anxiety that would reasonably aggravate physical pain.

Record at 23.

Higgins argues that the ALJ's statement that her testimony was not "entirely consistent" with the other evidence indicated that he was impermissibly employing a "clear and convincing evidence" standard. This is little more than a word game. It is quite evident that the ALJ did not reject Higgins's representations *in toto* because they were inconsistent with some parts of the evidence. If he had done that, he would not have found that Higgins had any limitations at all, and therefore would have found no severe impairments. Clearly, the ALJ meant that he accepted Higgins' representations partially, but not completely, because he did not find them to be fully supported by the record.

More substantially, Higgins argues that the ALJ erred in failing to consider the factors set forth in SSR 16-3p as relevant to a pain assessment: daily activities; duration, frequency, and intensity of pain and other symptoms; and any measures other than medications used to relieve pain and other symptoms.  She points out that the Function Evaluation she completed in April, 2016, described very limited activities of daily living, and many physical limitations.  Record at 240-247.

The ALJ did consider Higgins' Function Evaluation.  Record at 20.  He also addressed contrary evidence, such as Dr. Kleiman's "benign findings."  Record at 24.  Even in a fibromyalgia case, an ALJ is permitted to reject a plaintiff's subjective representations, as long as there is a sufficient explanation provided for doing so.  See Kennedy v. Saul, Civ. A. No. 18-5258, 2019 WL 6888190 at *6 (E.D. Pa. Dec. 16, 2019).  In itself, the ALJ's credibility analysis would probably not merit remand.

Nevertheless, it has been acknowledged that the symptoms of fibromyalgia are easy to fake.  Sarchet v. Chater, 78 F.3d 305, 306-7 (7th Cir. 1996).  For this reason, the credibility assessment is of paramount importance in a fibromyalgia case.  Albanese v. Berryhill, Civ. A. No. 16cv2350, 2017 WL 2540576 at *10 (D. Nev. June 12, 2017); Gregory v. Berryhill, supra; Charpentier v. Colvin, Civ. A. No. 12-312 S, 2014 WL 575724 at *13 (D.R.I. Feb. 11, 2014), and see Kurilla v. Barnhart, Civ. A. No. 04cv1724, 2005 WL 2704887 at *6 (E.D. Pa. October 18, 2005) ("Without any evidence to the contrary other than her erroneous determination that Kurilla lacked credibility, I must conclude that the ALJ impermissibly rejected Dr. Huppert's diagnosis [of fibromyalgia] without substantial evidence").

Thus, a particularly detailed and specific credibility assessment is warranted in this case. On remand, the ALJ should supplement his assessment of Higgins's credibility with an explicit discussion of the factors set forth in SSR 16-3p, and should accommodate the new medical evidence obtained from the fibromyalgia expert.

C.   Medication Side Effects

Higgins' final claim is that the ALJ did not adequately consider her claim to suffer side effects from her medication.  The ALJ acknowledged in his decision that Higgins claimed that her medication caused drowsiness, weight gain, dizziness, and difficulty sleeping.  Record at 20.  However, he did not make a finding as to the credibility of her representations.  Side effects of medication are a factor cited in SSR 16-3p as appropriate in assessing a claimant's subjective representations.  This will therefore be addressed in the supplemented pain assessment the ALJ is directed to make on remand, as discussed above.

V.   Conclusion

In accordance with the above discussion, I conclude that the decision of the ALJ should be reversed in part, and the matter remanded to the Agency for the taking of additional evidence from a rheumatologist and a revised assessment of Higgins' subjective representations under Social Security Ruling 16-3p.

BY THE COURT:

/s/ Jacob P. Hart

_____
JACOB P. HART
UNITED STATES MAGISTRATE JUDGE

12